**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JANICE CROCKER | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| BOSTON SCIENTIFIC | ) | |
| CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff, Janice Crocker ("Plaintiff"), by and through her attorneys of record, and files this Original Complaint and Jury Demand against Defendant BOSTON SCIENTIFIC CORPORATION ("Defendant") and states as follows:

## PARTIES

1.      This action seeks to recover damages for the injuries sustained by Janice Crocker ("Plaintiff") as the direct and proximate result of the wrongful conduct and negligence of the Defendant in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distributing, labeling, and selling of Uphold Mesh manufactured by Boston Scientific, implanted in the Plaintiff.

2.      Plaintiff Janice Crocker is a citizen and resident of the State of North Carolina, County of Johnston, and City of Clayton.

3.      Defendant BOSTON SCIENTIFIC CORPORATION is a Delaware corporation with its corporate headquarters and principal place of business in Massachusetts. All acts and omissions of Boston Scientific as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of its respective agencies, services, employments, and/or ownership.

1

4.      At all times relevant herein, Defendant, was engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling such devices, including the Uphold Mesh implanted in Plaintiff. At all times relevant hereto, and, upon information and belief, Defendant, manufactured, marketed advertised, promoted and sold the Mesh Product worldwide.

5.      Defendant, Boston Scientific Corporation., (hereinafter referred to collectively as "Defendant") had a legal duty to ensure the safety and effectiveness of its pelvic mesh product by conducting adequate and well-controlled studies on its product prior to marketing. Defendant deliberately chose to manipulate the only studies that were conducted on its product and by so doing provided doctors and patients in the United States with inaccurate information regarding the lack of proof of the safety and effectiveness of its pelvic mesh product. Furthermore, Defendant made a conscious decision to forego performing studies and creating registries that would have provided doctors, including Plaintiff's implanting physician, and patients in the United States with accurate information regarding the lack of proof of the safety and effectiveness of its pelvic mesh product.

## JURISDICTION AND VENUE

6.      Federal subject matter jurisdiction in the constituent actions is based upon 28 U.S.C. § 1332(a), in that there is complete diversity among Plaintiff and Defendant and the amount in controversy exceeds $75,000.

7.      Defendant has significant contacts with the United States District Court for the Eastern District of North Carolina such that they are subject to the personal jurisdiction of the court in said district.

8.      A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in in the United States District Court for the Eastern District of North Carolina. Pursuant

to 28 U.S.C. § 1391(a), venue is proper in said district.

## **FACTUAL BACKGROUND**

9.     Surgical mesh products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical mesh products designed for hernia repair for abdominal repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of pelvic organ prolapse (POP") and stress urinary incontinence ("SUI"). Manufacturers, including Defendant, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP and SUI. Today, Defendant sells pelvic mesh "kits" which can include not only the surgical mesh, but also tissue fixation anchors and insertion tools. The Uphold Mesh manufactured by Defendant (hereinafter referred to as the "Mesh Product") is considered Class II medical devices.

10.     The Mesh Product are targeted for women who suffer from stress urinary incontinence as a result of the weakening or damage caused to the walls of the vagina. These products are specifically promoted to physicians and patients as an innovative, permanent, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma and minimal pain while permanently correcting, stress urinary incontinence, and pelvic organ prolapse.

11.     Moreover, these Mesh Products contain polypropylene mesh. Despite claims that this material is inert, the scientific evidence shows that this mesh material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving the Mesh Product. This immune response promotes degradation of the polypropylene mesh, as well as the pelvic tissue, and can contribute to the formation of severe adverse reactions to the mesh.

12.     At various times, Defendant sought and obtained Food and Drug Administration ("FDA") clearance to market the Mesh Product under Section 51O(k) of the Medical Device Amendment.

Section 51O(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. This clearance process did not require Defendant to prove the safety or efficacy of the Mesh Product and, thus, a formal review of the safety and efficacy of the Mesh Product were never conducted with regard to the Product.

13.     At all times relevant hereto, the Mesh Product was marketed to the medical community, including Plaintiff's implanting physician, and directly to patients as safe, effective, permanent, reliable, medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, primarily, stress urinary incontinence, pelvic organ prolapse, and as safer and more effective as compared to the traditional products and procedures for treatment. Upon information and belief, the Defendant has consistently underreported and withheld information about the propensity of the Mesh Products to fail and cause injury and complications, and have misrepresented the efficacy and safety of the Mesh Products, through various means and media, actively and intentionally misleading the FDA, the medical community, patients, and the public at large.

14.     Despite the chronic underreporting of adverse events associated with the Mesh Products, eventually enough complaints were recorded for the FDA to issue a public health notification regarding the dangers of these devices.

15.     On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that "serious complications associated with surgical mesh for transvaginal repair of POP are not rare" (emphasis in the original).

16.     The FDA Safety Communication also stated, "Mesh contraction (shrinkage) is a previously unidentified risk of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA . . . Reports in the literature associate

mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

17.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologist Society ("AUGS") also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:

18.     "There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh. Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable." The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

19.     Plaintiff's type of injuries were reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion. 23. The FDA Safety Communication further indicated that the benefits of using transvaginal mesh products instead of other feasible alternatives did not outweigh the associated risks.

20.     Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk."

21.     Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologist Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the "White Paper"). In the White Paper, the FDA noted that the published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh- related complications that are not experienced by patients who undergo

traditional surgery without mesh."

22.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginal placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk." (Emphasis in original).

23.     The FDA White Paper further stated that "these products are associated with serious adverse events. Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non- mesh repair."

24.     In its White Paper, the FDA advises doctors to, inter alia, "Recognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications."

25.     The FDA concludes the White Paper by stating that it "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

26.     Defendant knew or should have known about the Mesh Products' risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

27.     Defendant knew or should have known that the Mesh Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

28.     Defendant had sole access to material facts concerning the defective nature of the Mesh Products and their propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons who used the Mesh Products.

29.     The scientific evidence shows that the material from which the Mesh Products are made is biologically incompatible with human tissue and promotes a negative immune response in a large

subset of the population implanted with the Mesh Products, including Plaintiff.

30.　　This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Plaintiff.

31.　　The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an Issue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Mesh Product was unreasonably susceptible to degradation and fragmentation inside the body.

32.　　The Mesh Product was unreasonably susceptible to shrinkage and contraction inside the body.

33.　　The Mesh Product was unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

34.　　At all times relevant hereto, the Mesh Product was marketed to the medical community and to patients, including Plaintiff and her implanting physician, as safe, effective, reliable, medical devices, implanted by safe and effective, minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of stress urinary incontinence, and other competing products.

35.　　Defendant omitted the risks, dangers, defects, and disadvantages of the Mesh Product, and advertised, promoted, marketed, sold, and distributed the Mesh Product as a safe medical device when Defendant knew or should have known that the Mesh Product was not safe for their intended purposes, and that the Mesh Product would cause, and did cause, serious medical problems, and in some patients, including Plaintiff, catastrophic injuries.

36.　　Contrary to Defendant's representations and marketing to the medical community and to

the patients themselves, the Mesh Product has high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making these products defective under the law.

37.     The specific nature of the Mesh Product's defects includes, but are not limited to, the following:

    a.   the use of polypropylene material in the Mesh Product and the immune reactions that result from such material, causing adverse reactions and injuries.

    b.   the design of the Mesh Product to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries.

    c.   biomechanical issues with the design of the Mesh Product, including, but not limited to, the propensity of the Mesh Product to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury.

    d.   the use and design of arms and anchors in the Mesh Product, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region.

    e.   the propensity of the Mesh Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body.

    f.   the inelasticity of the Mesh Product, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking).

g.  the propensity of the Mesh Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

h.  the hyper-inflammatory responses to polypropylene leading to problems including chronic pain and fibrotic reaction.

i.  the adverse tissue reactions caused by the polypropylene products, which are causally related to infection, as the polypropylene is a foreign material to the human body.

j.  the harshness of cross-linked polypropylene upon the female pelvic tissue, and the hardening of the product in the body.

k.  the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturers' instructions.

38.  The Mesh Product is also defective due to Defendant's failure to adequately warn or instruct Plaintiff and her implanting physician of subjects including, but not limited to, the following:

a.  the Mesh Product's propensities to contract, retract, and/or shrink inside the body;

b.  the Mesh Product's propensities for degradation, fragmentation and/or creep;

c.  the Mesh Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.  the rate and manner of mesh erosion or extrusion;

e.  the risk of chronic inflammation resulting from the Mesh Product; the risk of chronic infections resulting from the Mesh Product;

f.  the risk of permanent vaginal or pelvic scarring as a result of the Mesh Product;

g. the risk of recurrent, intractable pelvic pain and other pain and other pain resulting from the Mesh Product;

h. the need for corrective or revision surgery to adjust or remove the Mesh Product;

i. the severity of complications that could arise as a result of implantation of the Mesh Product;

j. the hazards associated with the Mesh Product;

k. the Mesh Product's defects described herein;

l. treatment of stress urinary incontinence with the Mesh Product is no more effective than feasible available alternatives;

m. treatment of stress urinary incontinence with the Mesh Product exposes patients to greater risk than feasible available alternatives;

n. treatment of stress urinary incontinence with the Mesh Product makes future surgical repair more difficult than feasible available alternatives.

o. uses of the Mesh Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives.

p. removal of the Mesh Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

q. complete removal of the Mesh Product may not be possible and may not result in complete resolution of the complications, including pain.

39. Defendant has underreported information about the propensity of the Mesh Product to fail and cause injury and complications and have made unfounded representations regarding the efficacy and safety of the Mesh Product through various means and media.

40. Defendant failed to perform proper and adequate testing and research in order to determine

and evaluate the risks and benefits of the Mesh Product.

41.   Defendant failed to design and establish a safe, effective procedure for removal of the Mesh Product, or to determine if a safe, effective procedure for removal of the Mesh Product exists.

42.   Practical and technically feasible alternatives to the Mesh Product have existed at the time of manufacture and conveyance that do not present the same frequency or severity of risks as do the Mesh Product.

43.   Practical, safer, and feasible alternatives have existed at all times relevant, including at the time of manufacture and conveyance that were available to Defendant that do not present the same frequency and severity of risks as does the Mesh Product. These safer, practical and feasible alternatives include but are not limited to:

> a. the use of sutures, including delayed absorbable sutures like PDS;
>
> b. autologous facia sling;
>
> c. an allograft sling such as Repliform;
>
> d. a sling with less polypropylene such as Ultrapro;
>
> e. collagen or biological material suspension products;
>
> f. corrective surgery without the use of mesh; and
>
> g. colposuspension procedures such as the Burch.

44.   The Mesh Products were at all times utilized and implanted in a manner foreseeable to Defendant, as Defendant generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

45.   Defendant provided incomplete and insufficient training and information to physicians regarding the use of the Mesh Product and the aftercare of patients implanted with the Mesh Product.

46.   The Mesh Product implanted in Plaintiff was in the same or substantially similar condition

as it was when it left Defendant's possession, and in the condition directed by and expected by Defendant.

47. The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Mesh Product include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and chronic pelvic pain.

48. In many cases, including Plaintiff's, the women have been forced to undergo extensive medical treatment, including, but not limited to operations to located and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine and the vagina, and operations to remove portions of the female genitalia.

49. The medical and scientific literature studying the effects of Defendants' mesh products, like that of the Mesh Products implanted in Plaintiff, has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the Mesh Products.

50. Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

51. At all relevant times herein, Defendant continued to promote the Mesh Product as safe and effective even when no clinical trials had been done supporting long- or short-term efficacy.

52. In doing so, Defendant failed to disclose to Plaintiff, Plaintiff's healthcare providers, and the medical community, the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Mesh Product.

53. At all relevant times herein, including at the time of manufacture and conveyance,

Defendant failed to provide sufficient warnings and instructions that would have put Plaintiff, Plaintiff's implanting physician, and the medical community, on notice of the dangers and adverse effects caused by implantation of the Mesh Product.

54.     The Mesh Product implanted in Plaintiff, as designed, manufactured, distributed, sold and/or supplied by Defendant was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendant's knowledge of lack of safety.

55.     Defendant knew that the Mesh Product, as designed, manufactured, distributed, sold and/or supplied by Defendant was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing.

56.     Defendant had a duty to exercise reasonable and ordinary care in the recruitment and training of physicians to implant the Mesh Product

57.     The Mesh Product as designed, manufactured, distributed, sold and/or supplied by Defendants was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of safety.

58.     Defendants' aforementioned acts and omissions constitute willful and or wanton conduct.

59.     The Mesh Product, as designed, manufactured, distributed, sold and/or supplied by Defendant, was defective as marketed at the time they left Defendant's control.

60.     On or about March 13, 2019, Plaintiff had the Mesh Product implanted at Johnston Health when she underwent a laparoscopic assisted hysterectomy, a bilateral salpingectoophorectomy, and a cystocele repair with Uphold Mesh to treat stress incontinence and female genital prolapse. During the procedure, a System Uphold Vaginal Support Lite with Capio Slim D-133 manufactured by Boston Scientific was implanted.

61.     Thereafter, on or about March 26, 2019, Plaintiff began experiencing painful and serious complications, including, but not limited to, post-operative sling. extreme post-operative pain,

urinary incontinence, and bleeding as a result of the Mesh Product being implanted in her. Her implanting physician recommended removal of the infected Mesh Product used for the cystocele repair to take place the next day.

62.     On or about March 27, 2019, Plaintiff presented to her implanting physician at Johnston Health complaining of right hip pain and complication of implanted vagina mesh, initial encounter (primary). Plaintiff's implanting physician diagnosed her with removal of infected vaginal mesh Uphold for cystocele repair.

63.     On or about March 27, 2019, Plaintiff underwent an additional operation for the removal of Mesh Products some of which was unable to be removed.

64.     On or about March 28, 2019, Plaintiff presented to her physician at Johnston Health complaining of post-operative infected implanted vaginal mesh. Plaintiff's wound culture came back 2+ Gram positive and 2+ WBCs, and as a result, Plaintiff received an infectious disease consult.

65.     As a result of having the Mesh Products implanted in her, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, the aforementioned injuries, has undergone medical treatment, including procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

**Fraudulent Concealment**

66.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through affirmative misrepresentations and omissions, actively concealed from Plaintiff, Plaintiff's physicians, the medical community, and the general public the true risks associated with the Defendants' mesh products, including the Mesh Product

implanted in Plaintiff.

67.     As a result of Defendant's actions, Plaintiff, and her implanting physician were unaware, and could not reasonably have known or have learned through reasonable diligence, that they had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

## COUNT I: NEGLIGENCE - DESIGN DEFECT

68.     Plaintiff hereby incorporates by reference all previous paragraphs and further states as follows:

69.     Plaintiff is an expected and ordinary user or consumer of the Mesh Product.

70.     The Mesh Product implanted in Plaintiff was conveyed in a condition not contemplated by reasonable persons among those considered expected users or consumers of the Mesh Product.

71.     Safer, feasible and suitable alternatives to the Mesh Product that were available to the Defendant have existed at the time of manufacture and conveyance that do not present the same frequency or severity of risks as does the Mesh Product. Safer and feasible alternatives include but are not limited to, human tissue slings, biological implants, native tissue repair, sutures, slings with less polypropylene, corrective surgery without implanted mesh, and pelvic floor therapy.

72.     The burden of implementing safer, feasible, and alternative designs would not have outweighed the reduction of injury caused to consumers, including Plaintiff.

73.     At the time of manufacture and conveyance, the Mesh Product failed to meet the minimum safety expectations of the ordinary user and consumer: Plaintiff expected that the Mesh Product would treat and/or remedy her stress incontinence and female genital prolapse and without causing the aforementioned serious and painful complications.

74.     The ordinary user and consumer would not consider the Mesh Product sufficiently safe given the aforementioned risks, dangers, and complications associated with the Mesh Product.

75. The aforementioned and foreseeable risks exceed and outweigh the benefit the Defendant purports the Mesh Product provides, that benefit being the treatment of stress urinary incontinence.

76. Defendant had a duty to individuals, including Plaintiff, to use reasonable care in designing, marketing, labeling, packaging, and selling the Mesh Product.

77. Defendant breached its duty to Plaintiff by failing to exercise due care under the circumstances.

78. Defendant knew or should have known Plaintiff could foreseeably suffer injury as a result of the defective design of the Mesh Product.

79. The Mesh Product implanted in Plaintiff was, at the time conveyed, not in conformity with the generally recognized state of the art applicable to the safety of the Mesh Product at the time they were designed, manufactured, packaged, labeled, and/or sold.

80. The Mesh Product implanted in Plaintiff were not reasonably safe for their intended uses and were defective as described herein with respect to their design. As previously stated, the Mesh Product's design defects include, but are not limited to:

    a. the use of polypropylene material in the Mesh Product and the immune reaction that results from such material, causing adverse reactions and injuries.

    b. the design of the Mesh Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries.

    c. biomechanical issues with the design of the Mesh Product, including, but not limited to, the propensity of the Mesh Product to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury.

    d. the use and design of arms and anchors in the Mesh Product, which, when

placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region.

e. the propensity of the Mesh Product to "creep," or to gradually elongate and deform when subject to prolonged tension inside the body.

f. the inelasticity of the Mesh Product, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation).

g. the propensity of the Mesh Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

h. the hyper-inflammatory responses to polypropylene leading to problems including chronic pain and fibrotic reaction.

i. the adverse tissue reactions caused by the polypropylene products, which are causally related to infection, as the polypropylene is a foreign material to the human body.

j. the harshness of cross-linked polypropylene upon the female pelvic tissue, and the hardening of the product in the body; and

k. the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

81.     Defendant was negligent in failing to use reasonable care as described herein in designing, marketing, labeling, packaging, and selling the Mesh Product. Defendant breached its aforementioned duty by:

a. Failing to design the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product were implanted, including Plaintiff.

b. Failing to manufacture the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product were implanted, including Plaintiff.

c. Failing to use reasonable care in the testing of the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product were implanted, including Plaintiff.

d. Failing to use reasonable care in inspecting the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product were implanted, including Plaintiff.

e. Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Mesh Product.

82.     As a direct and proximate result of the Plaintiff being implanted with the Mesh Product's aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including multiple procedures to correct her injuries and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including but not limited to obligations for medical services and expenses, and/or lost income and other damages.

83.     As a direct and proximate result of Defendant's negligence as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## COUNT II: NEGLIGENCE - FAILURE TO WARN

84.     Plaintiff hereby incorporates by reference all previous paragraphs and further states as follows:

85.     Defendant had a duty to exercise reasonable care in the advertising and sale of the Mesh Product, including a duty to warn and instruct Plaintiff's implanting physician, of the dangers associated with the use of the Mesh Product that were known or should have been known to Defendants at the time of the sale of the Mesh Product to the Plaintiff.

86.     Defendant knew or should have known Plaintiff could foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care in providing adequate warnings as described herein

87.     Defendant breached its duty to Plaintiff by failing to exercise due care under the circumstances

88.     The Mesh Product implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein as a matter of law due to its lack of appropriate and necessary warnings. Specifically, Defendant negligently failed to provide sufficient or adequate warnings to Plaintiff, Plaintiff's healthcare providers, or the medical community regarding among other subjects:

    a.  the Mesh Product's propensities to contract, retract, and/or shrink inside the body.

    b.  the Mesh Product's propensities for degradation, fragmentation, disintegration and/or creep.

    c.  the Mesh Product's inelasticity preventing proper mating with the pelvic floor and vaginal region.

    d.  the rated and manner of mesh erosion or extrusion.

    e.  the risk of chronic inflammation resulting from the Mesh Product.

    f.  the risk of chronic infections resulting from the Mesh Product.

g. the risk of permanent vaginal or pelvic scarring as a result of the Mesh Product.

h. the risk of recurrent, intractable pelvic pain and other pain resulting from the Mesh Product.

i. the need for corrective or revision surgery to adjust or remove the Mesh Product.

j. the severity of complications that could arise as a result of implantation of the Mesh Product.

k. the hazards associated with the Mesh Product.

l. the Mesh Product's defects described herein.

m. treatment of stress urinary incontinence with the Mesh Product is no more effective than feasible available alternatives.

n. treatment of stress urinary incontinence with the Mesh Product exposes patients to greater risk than feasible available alternatives.

o. treatment of stress urinary incontinence with the Mesh Product makes future surgical repair more difficult than feasible available alternatives.

p. the use of the Mesh Product puts the patient at a greater risk of requiring additional surgery than feasible available alternatives.

q. removal of the Mesh Product due to complications may involve multiple surgeries and may significantly impair the patients' quality of life; and

r. complete removal of the Mesh Product may not be possible and may not result in complete resolution of the complications, including pain.

89. Defendant, by excising reasonable diligence, could have made such warnings available to Plaintiff, Plaintiff's healthcare providers, and the medical community.

90.     As a direct and proximate result of Defendant's failure to provide Plaintiff, Plaintiff's healthcare providers, and the medical community with sufficient or adequate warnings, Plaintiff and Plaintiff's healthcare providers were not adequately informed of the potential dangers and/or defects of the Mesh Product.

91.     Had Plaintiff's implanting physician had been adequately warned of the unreasonable dangers and risks of the Mesh Product, Plaintiff's physician would not have recommended the use of the Mesh Product in Plaintiff and/or recommended safer feasible alternatives, and Plaintiff's injuries could have been avoided.

92.     Had Plaintiff's implanting physician been adequately warned of the aforementioned risks, complications, and dangers, Plaintiff's implanting physician would have informed of this information, and Plaintiff would not have consented to the implantation of the Mesh Product.

93.     As a direct and proximate result of the Mesh Product's aforementioned defective warnings as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including multiple procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

94.     As a direct and proximate result of Defendant's negligence, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages

## <u>COUNT III – BREACH OF IMPLIED WARRANTY</u>

95.     Plaintiff hereby incorporates by reference and reavers each and every allegation contained

in the foregoing paragraphs of this Complaint as if fully set forth herein and further states and alleges as follows:

96.     The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the good and became part of the basis of the bargain creating an implied warranty that the good shall conform to the affirmations of fact or promises.

97.     At the time of making such implied warranties, Defendant knew or should have known that the Mesh Product did not conform to these representations because the Mesh Product was not safe and have numerous side effects, many of which Defendant did not accurately warn about, thus making the Mesh Product unreasonably unsafe for its intended purpose.

98.     Members of the medical community, including physicians and other healthcare professionals, as well as Plaintiff and her implanting physician, relied upon the representations and warranties of Defendant in connection with the use recommendation, description, and/or dispensing of the Mesh Product.

99.     Plaintiff and Plaintiff's implanting physician, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

100.    At all relevant and material times, Defendant manufactured, distributed, advertised, promoted and sold the Mesh Product.

101.    At all relevant times, Defendant intended that the Mesh Products be implanted for the purposes and in the manner that Plaintiff or Plaintiff's implanting physicians in fact used them and Defendants impliedly warranted each product to be of merchantable quality, safe and fit for such use, and was not adequately tested.

102.    At all relevant and material times, Defendant developed, designed, manufactured, labeled, packaged, distributed, marketed, supplied, advertised, sold and otherwise engaged in all activities

that are part and parcel of the sale and distribution of its product, the Mesh Product, representing the quality and effectiveness to health care professionals, the FDA, Plaintiff and Plaintiff's implanting physician in such a way as to induce its purchase or use, thereby making an express warranty that the Mesh Product would conform to the representations. More specifically, Defendant represented that the Mesh Product was safe and effective, that it was safe and effective permanent implant for use by individuals such as Plaintiff, and/or that it was safe and effective to treat Plaintiff's conditions.

103.    Defendant was aware that consumers, including Plaintiff and/or Plaintiff's physicians, would implant the Mesh Product in the manner directed by the instructions for use; which is to say that Plaintiff was a foreseeable user of the Mesh Product.

104.    Plaintiff and/or her physicians were at all relevant times in privity with Defendant.

105.    Defendant received notice of the alleged breach of implied warranty through Plaintiff's counsel.

106.    The Mesh Product was expected to reach and did in fact reach consumers, including Plaintiff or Plaintiff's physicians, without substantial change in the condition in which they manufactured and sold the Mesh Product.

107.    Defendant breached various implied warranties with respect to the Mesh Product, including the following particulars.

        a.    Defendant represented through its labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters and regulatory submissions that the Mesh Product was safe and fraudulently withheld and concealed information about the substantial risks of serious injury and/or death associated with using the Mesh Product;

        b.    Defendant represented that the Mesh Product was safe, and/or safer than

other alternative devices or procedures and fraudulently concealed information, which demonstrated that the Mesh Product was not as safe or safer than alternatives available on the market; and

c.    Defendant represented that the Mesh Product was more efficacious than other alternative medications and fraudulently concealed information regarding the true efficacy.

108.    In reliance upon Defendant's implied warranty, Plaintiff used the Mesh Product as prescribed and in the foreseeable manner normally intended, recommended, promoted and marketed by Defendant.

109.    Defendant breached its implied warranty to Plaintiff in that the Mesh Product was not of merchantable quality, safe and fit for its intended use, or adequately tested, in violation of Common Law principles.

The Mesh Product implanted in Plaintiff failed to function as intended and as represented by Defendants because it did not relieve the symptoms or otherwise alleviate the medical condition it was intended to permanently treat and/or cure; that being Plaintiff's stress incontinence and ffemale genital prolapse. Instead, the Mesh Product contained the aforementioned defects that caused Plaintiff suffer, most likely permanently, from lower back pain, hip pain, prolapse, urinary urge incontinence, vaginal discharge, vaginal drainage, vaginal bleeding, gapping of the anterior vaginal wall, purulent discharge, recurrent cystocele and enterocele and other severe, long-term risks of future erosion, infection, vaginal pain and pelvic pain. Plaintiff will additionally likely experience chronic foreign body reaction and chronic inflammation for as long as the mesh remains in her body. Because the Mesh Product failed to conform to representations and were not suitable for the purpose for which they were used, Defendant has breached its implied warranties.

110.    As a direct and proximate result of Defendant's wrongful conduct, including Defendant's

breach of implied warranty, Plaintiff has sustained and will continue to sustain severe and debilitating injuries, serious bodily injury, mental and physical pain and suffering and has incurred economic loss.

WHEREFORE, Plaintiff demands a trial by jury, judgment against Defendant for compensatory and punitive damages in an amount exceeding $75,000, as well as costs, interest, or any other relief, monetary or equitable, to which they are entitled.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated November 5, 2021

Respectfully submitted,

/s/ John Szymankiewicz

By: _____ NC Bar 41623

John Szymankiewicz

MATHESON & ASSOCIATES PLLC

127 W Hargett St #100

Raleigh, NC 27601

Phone (919) 335-5291

info@mathesonlawoffice.com

Fatima Abuzerr

Pending Pro Hac Vice Admission

MOLL LAW GROUP

22 W Washington St, 15th Floor

Chicago, IL 60602

T: (312) 462-1700

fabuzerr@molllawgroup.com

info@molllawgroup.com

**COUNSEL FOR PLAINTIFF**